WMG

FILED
SEP 1 2 2022
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK


UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:22-CR-107

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL INFORMATION |
| ) | |
| JAMES CRAIG BELL ) | |

The United States Attorney charges as follows:

GENERAL ALLEGATIONS

At all times relevant to this Information:

A. THE MEDICARE AND MEDICAID PROGRAMS

1. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare covered different types of benefits and was separated into different program "parts." Medicare Part D subsidized the cost of prescription drugs for Medicare beneficiaries in the United States. Generally, Medicare Part D covered part or all of the costs of prescription drugs dispensed to a Medicare beneficiary if, among other requirements, the prescription drugs were medically necessary and ordered by a

physician.

3. In order to receive Medicare Part D benefits, a beneficiary enrolled in one of several Medicare drug plans. Medicare drug plans were operated by private health care insurance companies approved by Medicare. Those companies were often referred to as drug plan "sponsors." (As used herein, the term "Medicare" shall encompass these private drug plan sponsors.) A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription drugs.

4. Medicare, through CMS, compensated the Medicare drug plan sponsors for providing prescription drug benefits to beneficiaries. Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments were called capitation fees. The capitation fee was adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

5. The North Carolina Medicaid program ("Medicaid") was a federal and state funded health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including North Carolina. Individuals who received benefits under Medicaid were referred to as Medicaid "recipients."

6. Medicaid covered the costs of certain medical services, products, and benefits, including prescription drug benefits, for Medicaid recipients. Generally, Medicaid covered part or all of the costs of prescription drugs dispensed to a Medicaid recipient if, among other requirements, the prescription drugs were medically necessary and ordered by an authorized provider.

7. Medicare and Medicaid, were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b).

### B. PRIVATE HEALTH INSURANCE PLANS

8. Various private health insurance companies and plans, referred to collectively herein as the "Private Health Plans," were authorized and licensed to do business in the state of North Carolina. The Private Health Plans provided health care benefits, including prescription drug benefits, to member entities and individuals. Individuals insured by the Private Health Plans are referred to herein as "members."

9. The Private Health Plans had agreements with participating providers, including pharmacies, to furnish medical services to their members.

10. The Private Health Plans were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

11. The Private Health Plans included, but were not limited to, Blue Cross and Blue Shield of North Carolina.

### C. PHARMACY BENEFIT MANAGERS

12. Pharmacy benefit managers ("PBMs") managed prescription drug

benefits provided by Medicare and Private Health Plans. PBMs received, adjudicated, and paid claims on behalf of these health care benefit programs.

13. After a pharmacy dispensed a prescription drug to a beneficiary, recipient, or member, the pharmacy submitted a claim, typically electronically, to the PBM acting on behalf of the specific health care benefit program. The PBM, on behalf of the health care benefit program, reimbursed the pharmacy, typically electronically, through direct deposits into accounts held, and previously identified, by the pharmacy.

14. CVS Caremark, OptumRx, and Express Scripts were three of several PBMs that managed prescription drug benefits for Medicare and Private Health Plans.

15. References in this Criminal Information to billings and claims submitted to Medicare and Private Health Plans, include any such billings and claims made by, to, or through PBMs.

### D. THE PHARMACY

16. All Medicines, Inc., was a North Carolina corporation doing business as "Townsend's Pharmacy." Townsend's Pharmacy operated at 111 S. Main Street, Red Springs, North Carolina, within the Eastern District of North Carolina.

17. During all times material to this Information, Townsend's Pharmacy was registered with Medicare, Medicaid, and Private Health Plans, to receive payment for medicines that were: (1) prescribed by licensed medical providers, and (2) actually dispensed by Townsend's Pharmacy.

### E. THE DEFENDANT

18.     Defendant JAMES CRAIG BELL was the owner of Townsend's Pharmacy.

19.     Beginning at an exact time unknown, but no later than the year 2006, BELL began to cause Townsend's Pharmacy to bill Medicare, Medicaid, and Private Health Plans for various drugs that were not actually being dispensed by the pharmacy.

20.     As early as 1997, BELL employed Melisha West at Townsend Pharmacy. BELL and other employees at Townsend Pharmacy taught West the pharmacy trade through on-the-job training.

21.     Early in WEST's employment at Townsend's Pharmacy, BELL trained West how to bill health care benefit plans for drugs that were not authorized or dispensed. This training included, but was not limited to, how to fraudulently re-authorize a previously existing prescription from a licensed medical provider for a particular drug; and how to falsely bill health care benefit programs as though a drug had been dispensed.

22.     BELL, West, and others at Townsend's Pharmacy routinely and collectively billed healthcare benefit programs for drugs that were not authorized or dispensed.

23.     Although BELL eventually allowed West to carry out the majority of the pharmacy's operations on her own, including fraudulent billing practices, BELL,

West, and other pharmacy employees continued to financially benefit from the fraudulent billing practices.

## COUNT ONE

24. Paragraphs 1 through 23 of the General Allegations section of this Information are re-alleged and incorporated by reference as though fully set forth in this Count.

25. Beginning at a time unknown, but no later than 2006, and continuing through at least July of 2017, in the Eastern District of North Carolina and elsewhere, JAMES CRAIG BELL and others known to the United States Attorney, did knowingly combine, conspire, confederate, and agree to commit an offense against the United States, specifically, to knowingly and willfully execute and attempt to execute a scheme and artifice to: (1) defraud health care benefit programs as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, Private Health Plans; and (2) obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs; in connection with the delivery of and payment for health care benefits, items, and services; in violation of Title 18, United States Code, Section 1347 ("Health Care Fraud").

## PURPOSE OF THE CONSPIRACY

26. It was a purpose of the conspiracy for Townsend's Pharmacy, and those working there, to financially benefit from: (a) submitting, and causing to be

submitted false and fraudulent claims to Medicare, Medicaid, and Private Health Plans; and (b) concealing, and causing the concealment of, the submission of false and fraudulent claims to Medicare, Medicaid, and Private Health Plans.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

27. BELL and others maintained a national provider identifier for Townsend's Pharmacy in order to submit pharmacy claims to Medicare, Medicaid, and Private Health Plans.

28. BELL and others maintained software at Townsend's Pharmacy, known as the "VIP System," that was utilized for filling prescriptions and submitting claims for payment to Medicare, Medicaid, and Private Health Plans. In addition to patient information, the VIP system required the user to input identification information for the prescribing provider, the drug prescribed, the quantity prescribed, and the number of refills authorized. The VIP system electronically transmitted this and other information to Medicare, Medicaid, and Private Health Plans in connection with claims for payment.

29. BELL and others used the VIP system to bill Medicare, Medicaid, and Private Health Plans for the distribution of drugs that were not, in fact, authorized or dispensed. To do so, BELL and others would enter false information into the VIP system, to wit, the prescription information, the identity of the prescribing provider,

the drug and drug quantity, and whether the drug was actually dispensed.

30. In conjunction with the use of the VIP system to dispense drugs and file claims, drug labels were routinely generated. When BELL and others at Townsend's Pharmacy billed for a drug that was not, in fact, dispensed, they generally placed the corresponding label in a box at the pharmacy. By keeping the labels in a box, BELL and others could utilize the label in the event that a patient actually requested a drug that had already been billed as though dispensed. Otherwise, BELL and others would purge the box of labels every few months.

31. BELL and others working at Townsend's Pharmacy failed to order from drug manufacturers the quantity of drugs that were billed to Medicare, Medicaid, and Private Health Plans as though they had been dispensed.

32. BELL and others at Townsend's Pharmacy routinely failed to charge and collect copayments from patients.

33. BELL and others at Townsend's Pharmacy failed to reimburse Medicare, Medicaid, and Private Health Plans the amount of money Townsend's Pharmacy received for drugs that were never dispensed.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE NOTICE

The defendant is given notice that all of the defendant's interest in all property specified herein is subject to forfeiture.

Upon conviction of the offense set forth in the Information, the defendant shall

forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 18, United States Code, Section 981 (a)(1)(C), the latter as made applicable by 28 U.S.C. § 2641(c), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

The forfeitable property includes, but is not limited to, the gross proceeds personally obtained by the defendant.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant --

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

MICHAEL F. EASLEY, JR.
United States Attorney

BY: WILLIAM M. GILMORE
Assistant United States Attorney